PHILLIPS PETROLEUM COMPANY, A CORPORATION, APPELLEE,
v. CITY OF OMAHA, A MUNICIPAL CORPORATION, APPELLANT.

106 N. W. 2d 727

Filed December 16, 1960. No. 34831.

*Herbert M. Fitle, Bernard E. Vinardi, Irving B. Epstein, Frederick A. Brown, Benjamin M. Wall, Edward M. Stein,* and *Steven J. Lustgarten,* for appellant.

*Gaines, Spittler, Neely, Otis & Moore,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

Phillips Petroleum Company, appellee, appealed to the district court for Douglas County from the assess-

ment of damages made by the appraisers appointed in proceedings initiated in the county court of Douglas County by the City of Omaha, appellant, for the appropriation by the exercise of the power of eminent domain of specifically described real estate within the city for use by it in the improvement of streets. The contesting parties in this court are Phillips Petroleum Company and City of Omaha.

The substance of the amended petition of appellee in the district court was that it was a corporation authorized to do business in Nebraska; that appellant was a city of the metropolitan class of Nebraska; that appellee was at all the times important to the litigation the lessee of the real estate involved herein; that its lease of the premises provided that the lessee should have an option to purchase the leased premises free from any encumbrances at any time during the term or any extension or renewal of the term of the lease for an amount stated therein; that on November 4, 1954, appellant commenced condemnation proceedings to acquire the described premises; that the award of the appraisers appointed therein made to appellee was $6,325; that the real estate involved was a part of a tract used for many years and then used by appellee as a service station; that it had been by appellee improved by placing thereon buildings and concrete driveways, and installing equipment and other things usual and incidental to such a modern place of business; that the taking of the property described herein, the changing of the grades, and the constructing of improvements for which the land was taken have damaged the property of the service station tract not appropriated, and necessitated the alteration of the service station facilities and reconstruction of various improvements including removal of diesel and truck fuel tanks, removal of liquid propane gas tanks, removal and replacement of pump islands, removal and grading of concrete driveways and replacement of concrete surface thereon, replacement of signs, incidental wiring,

and installation of equipment; that by reason of the facts alleged appellee had been caused damage to the property not taken of $12,500 and damage by reduction in the market value of the premises remaining because of the loss of the part taken of $30,000; and that appellee refused the award made by the appraisers and has, as provided by law, prosecuted an appeal therefrom to the district court for Douglas County. Appellee asked from appellant the sum of $42,500.

The answer of appellant was in substance an admission of the appropriation by it of the real estate involved by the exercise of the power of eminent domain; an allegation that the award of the appraisers to appellee was fair and just for the damages sustained by it; and a denial of all other matters stated by appellee in its amended petition.

The result of the trial of the issues made by the pleadings had to a jury was a verdict for appellee of $13,168.80. A motion for new trial was denied. This appeal is from the judgment and the order denying a new trial.

The property leased by the appellee from the owner of it consisted of about 10,000 square feet located at the southeast of the intersection of Dodge and Seventy-second Streets in the city of Omaha. The former was north and the latter west of it. The property was irregular in shape and it was roughly somewhat like the shape of home plate of a baseball diamond with the base or longest property line thereof being to the north along the south boundary of Dodge Street. Appellee secured a lease of the ground, which was unimproved, July 1, 1935, and soon thereafter it modestly improved it as a motor vehicle service station, hereafter designated station, appropriate to the conditions then existing. Appellee constructed thereon a cottage-type building without any service bay in which to wash, polish, or service motor vehicles. Appellee put in three pumps in the front of the building which faced Dodge Street and two pumps to the west of the building on the Seventy-

second Street side. It installed lights, wiring, and signs.

The site of the station was in 1953 substantially cleared and an entire new modern one was erected including the construction of a new building consisting of an office, two bays in which to service motor vehicles, two new pump islands and four pumps on Dodge Street, and a pump island and two pumps thereon on the Seventy-second Street side. The station area and the driveways on the Dodge Street side were paved. On the Seventy-second Street side the graveled surface was continued because of the contemplated widening of that street. All facilities and modern incidentals were installed including those for supplying liquified petroleum gas to the public. There were then four 35-feet-wide drives for access of vehicles to and from the station, two on the Seventy-second Street side and two on the Dodge Street side. A part of the street right-of-way between the property line of the leased property and the curb line of the streets was improved by appellee as a part of the driveways as access to and from the station. The grade of the station site when it was improved in 1953 was established in harmony with the street grade or elevation at the south edge of the pavement on Dodge Street and at the east edge of the pavement on Seventy-second Street. This was the situation when the condemnation proceedings were commenced for the appropriation by the city of 523 square feet of the area leased by appellee at the northwest corner or part thereof for use of appellant in enlarging the rights-of-way of and improving each of the streets at the intersection and for a considerable distance from it.

The north property line of the land condemned by appellant was the south right-of-way line of Dodge Street. The west line of the property condemned extended substantially north and south from Dodge Street for about half of the distance of the line and then it ran somewhat in a northeasterly direction. The other boundary line of the area taken was a curved line extending from the

south end of the property line thereof on the west to the east end of the property line thereof on the north. The south point of the area taken was near the south boundary line of the south driveway from Seventy-second Street into the station and the east point of the area taken extended east about two-thirds of the width of the west driveway from Dodge Street into the station. This resulted in the station being deprived of each of these driveways as they existed before and at the time of the condemnation.

After the condemnation in 1955 Seventy-second Street was changed and improved from a point north of Dodge Street south to Pacific Street, and Dodge Street was changed and improved for about 1,300 feet east and west of Seventy-second Street. The intersection of Dodge and Seventy-second Streets was made a channelized intersection which means that traffic islands were installed therein to channel traffic in places where the highway authorities believed they belonged. Structures were placed in the intersection to control the traffic and all four legs of the intersection had channelizing islands in each quadrant of it to separate the right-turn vehicles from the through traffic. The purpose of this was to facilitate the improvement of right-turning traffic and separate it from through traffic so that the former could proceed without being interfered with by the traffic going through the intersection. This character of transformation of the intersection was thought to be justified because of the volume of the traffic using it. The result of the changes made and structures erected in the streets at and near this intersection eliminated the easy access to the station as it existed before the condemnation. There had been ingress and egress to the station from Dodge Street by the two driveways toward the east of the site of the station and this gave a good angle of approach. After the condemnation a sharp turn into it was required. The egress from the station to Seventy-second Street was

lost to the station. The free right turn from Seventy-second Street into Dodge Street gave traffic the right and freedom to make that turn without interference and this made it very difficult for Dodge Street traffic to turn and get in the station from Dodge Street. Traffic moving north on Seventy-second Street could not get into the station and be served at it and then return to that street and resume its travel to the north. The station had the benefit of traffic both ways, north and south, on Seventy-second Street before the condemnation but since then southbound traffic desiring to continue south must make a left turn on Dodge Street and enter the station. After it is served it must return to Dodge Street and go east on it because of the dividing center island on that street which extends about a block and a half to the east. All westbound traffic on Dodge Street is lost to the station because it cannot cross that street and enter the station. Likewise, traffic going north on Seventy-second Street which desires to turn west on Dodge Street cannot enter the station because it cannot leave it and go west on that street.

After the condemnation and the changes in the streets there was only one driveway into the station from Seventy-second Street and it was near the south part of the station site. There were two entrances to it from Dodge Street. Traffic northbound on Seventy-second Street had a free turn to the right into Dodge Street, that is, a means of turning to the right against the traffic-control lights and merging into the general traffic flow in the direction of the turn, and this had an adverse effect on entrance of vehicles into the station from Dodge Street because normal traffic on that street was constantly conflicting with the merging traffic in front of the station entrances. The things recited above were a damage to the remaining station site because the evidence is that it is necessary to a station operation to have ease of ingress and egress to accommodate traffic to and from it.

There was evidence that the grade or elevation on Dodge Street was changed from what it was before the condemnation. The changes shown at three stations on the north property line were 1.38 feet, 1.00 foot, and 1.05 feet, respectively. Appellee prepared plot plans of the station for use in remodeling it in 1953. The plans were submitted to appellant for approval when appellee applied for a building permit to do the work. The plans showed the grades proposed on the station site. The slope between the property line and the curb line of the paving before the condemnation was about one-fourth inch per foot. Appellant saw and approved these plans before the construction.

There was evidence that the best use of the property leased to appellee was a station; that repairs, replacement, and alterations were required to be made to the station site after the condemnation and the street improvements had been completed; and that the reasonable cost of such restoration was proven as a separate element of severance damage not included in the lost market value of the remainder of the property.

There was proof of all elements and items of damage alleged by appellee in its amended petition, the total of which was greatly in excess of the amount of the verdict. It is assumed, as it is required to be because of the character of the case and because the finding of the jury was for appellee, that all controverted matters were on the trial resolved in favor of it. Bolio v. Scholting, 152 Neb. 588, 41 N. W. 2d 913.

The assignment of appellant that the court erred in overruling its motion for a new trial is too general to require any consideration on this appeal. Wieck v. Blessin, 165 Neb. 282, 85 N. W. 2d 628. Likewise, the failure of appellant to discuss the assignment in its brief disregards the requirement of the rules of this court that an assignment to require the consideration of the court must be discussed by the party making it. Revised Rules of the Supreme Court, rule 8a 2(4). Hart-

man v. Hartmann, 150 Neb. 565, 35 N. W. 2d 482.

The trial court as a part of instruction No. 1 advised the jury that appellee alleged it was lessee of the real estate described in its amended petition and involved herein; that the lease contained in substance a provision that the lessee shall have an option to purchase the leased premises free of liens and encumbrances at any time during the extension or renewal term of the lease for the sum of $15,000; and that the lease had been extended and renewed for a period expiring August 2, 1961. The substance of a subsequent part of the charge to the jury said that it should return a verdict for appellee if it had established by the greater weight of the evidence that it had been damaged by reason of the condemnation proceeding in one or more of the respects charged by it in instruction No. 1, the nature and amount of the damage, and the amount which would be fair and just compensation to appellee for any loss to it. Appellant argues that the jury should not have been advised of the option provision of the lease because it was foreign to any issue in the case; that the instructions noticed above invited and permitted the jury to consider the option and to compensate appellee for any damage the jury found it sustained because of the condemnation of a part of the real estate in reference to which the option was granted; and that an option to purchase real estate which has not been exercised does not create an interest in the optionee entitling him to an award in condemnation proceedings appropriating a part or the whole of the real estate. This invites a consideration of the character and effect of an option.

In Keogh v. Peck, 316 Ill. 318, 147 N. E. 266, 38 A. L. R. 1151, the court said: "An option, originally, is neither a sale nor an agreement to sell. It is simply a contract by which the owner of property agrees with another person that he shall have the right to buy his property at a fixed price within a time certain. The

owner does not then sell his land or any interest in it. He does not then agree to sell it, but he does then sell the right or privilege to buy at the election or option of the other party. The second party gets, in praesenti, not lands or an interest therein, or an agreement that he shall have lands, but he does get something of value,— that is, the right to call for and receive lands if he elects."

`Morgan v. Forbes, 236 Mass. 480, 128 N. E. 792, contains the following: "An option to purchase real estate is a unilateral contract by which the owner of the property agrees with the holder of the option that he has the right to buy the property according to the terms and conditions of the contract. By such an agreement the owner does not sell the land, nor does he at the time contract to sell. He does, however, agree that the person to whom the option is given shall have the right at his election or option to demand the conveyance in the manner specified. It is merely the right to an election which has been sold and the owner of this right is not bound to complete the sale." See, also, Annotation, 87 A. L. R. 566; 67 C. J. S., Option, p. 511.

It has been decided that an option for the purchase of real estate by the optionee may not before it is exercised be considered in the assessment of damages caused by condemnation of the real estate.

Cravero v. Florida State Turnpike Authority (Fla.), 91 So. 2d 312, states: "We agree with the trial judge that the Craveros had only an option to purchase and that an option to purchase which has not ripened into a mutually binding contract by having been exercised prior to the time of the entry of the award is not such an interest in the condemned property as to entitle the optionee to share in the award."

East Bay Municipal Utility Dist. v. Kieffer, 99 Cal. App. 240, 278 P. 476, states: "An option to purchase land does not constitute an interest in the land itself, but it is a mere right of election to accept or reject a

present offer within the time fixed, and the holder of a mere option to purchase lands sought to be condemned is not entitled to any part of the compensation to be paid therefor, nor to any damages by reason of the severance of such lands from other lands owned by him."

In Cornell-Andrews Smelting Co. v. Boston & P. R. R. Corp., 209 Mass. 298, 95 N. E. 887, it is said: "An option, giving to the lessee of real estate a right at his election to buy the fee at any time during the term of the lease, although it adds to the value of the lessee's rights under the lease, is no part of the lessee's estate in the land, but is merely a contract right." In the opinion it is said: "We understand that the learned counsel for the petitioner in effect concedes that ordinarily the only person who can bring a petition for compensation is the owner of an estate in the land. His argument is that the option added to the value of the lessee's leasehold interest, and if it did he has asked with great insistence why the petitioner should not have compensation for the diminution in the value of all his rights under the lease including the option. * * * But the real objection to this contention is that, although the insertion in a lease of an option giving to the lessee at his option a right to buy the fee adds to the value of the lessee's rights under the lease, it is no part of the lessee's estate in the land. It is a contract right and nothing more, although contained in the lease and although it is a contract right which passes to an assignee of the lease. It is not an extension or amplification of the lessee's estate. * * * The lessee's rights under such an option are rights which lie in contract and do not create in the lessee any estate in the land. Being rights which lie in contract, the lessee as the holder of such an option cannot bring a petition for damage done to the land, or intervene in one brought by the owner of an estate in the land. Neither can he in a petition brought by himself as lessee (to recover the compensation due for damage done to his estate in the land) have the value

of his estate in the land increased by the value of the option."

People v. Ocean Shore R. R. Co., 90 Cal. App. 2d 464, 203 P. 2d 579, adopted the following from a prior opinion:   " 'The primary question here is the nature and extent of Middleton's interest in the property at the time of the taking by the state.  If the agreements here constituted merely an option to purchase, then the exact date of the taking by the state becomes unimportant, as "The holder of an option to purchase land being condemned has no interest in the land which will entitle him to compensation * * *" (29 C. J. S. 1101; East Bay Mun. Utility Dist. v. Kieffer, 99 Cal. App. 240 [278 P. 476, 279 P. 178].)' "

Appellee argues that the doctrine of the foregoing cases is not applicable in this jurisdiction because the owner of an interest in property less or different than an estate in real estate is permitted to recover compensation in condemnation.  Appellee presumes to sustain this hypothesis in this manner:  The statute does not restrict compensation for loss caused by condemnation only to those possessed of an estate or interest in real estate.  The statutory definition of property is any interest in real or personal property as the condemner is empowered by law to acquire for public use.  § 76-701, R. R. S. 1943.  The constitutional provision is that no property shall be taken or damaged for public use without just compensation.  Art. I, § 21, Constitution of Nebraska.  This case is a condemnation by appellant by virtue of its charter provision enabling it to exercise the power of eminent domain the substance of which is that the council may acquire, by the exercise of the power of eminent domain, private property or public property which is not devoted to public use, for municipal purposes, including street purposes.  § 14-366, R. R. S. 1943.  Therefore, this state does not limit the recovery of compensation to the owner of an interest or estate in real estate but it ex-

pressly provides for compensation for the appropriation of or damage to personal property by condemnation. Appellee says this court has recognized this doctrine. State v. Platte Valley Public Power & Irr. Dist., 147 Neb. 289, 23 N. W. 2d 300, 166 A. L. R. 1196.

The courts of New York discussed a similar contention. In In re Water Front in Tompkinsville, 219 App. Div. 387, 220 N. Y. S. 23, the appellate division decided that a lessee with an option to purchase real estate was entitled to be compensated for the value of the option in proceedings involving the real estate because that state permitted the owner of an interest less than an estate or interest in land to have compensation in condemnation. In that decision it is said: "But it is claimed by respondent that a lessee's option to purchase is not an estate for which he is entitled to recover compensation in addition to the value of his leasehold, citing 20 C. J. 742, § 194, and Cornell-Andrews Smelting Co. v. Boston & P. R. Corp., 209 Mass. 300, 95 N. E. 887. I do not think, however, that these authorities have any application to the case at bar, because, under the statute which governs the right to compensation for taking property in condemnation, in this proceeding, such right does not depend upon the possession by claimant of an estate, legal or equitable, in the land, as that term is usually understood in the law." It was also held therein that a provision in the lease which contains the option that if the premises involved were taken by eminent domain the lease should cease and come to an end, applied only to the lease and not to the option. That decision was disapproved by the Court of Appeals in In Re Application of City of New York, 246 N. Y. 1, 157 N. E. 911, in which it is said: "The tenant in this case had not exercised its option at the time title was taken by the city, October 11, 1919. In fact, it has never exercised its option. The option alone gave the lessee no interest in the real estate. He became a purchaser only upon the due exercise of the option. * * * The

reason for this is apparent. If the lessee had exercised his option prior to condemnation, he would be bound by his election as well as the owner. Therefore, if the premises should bring on condemnation less than the option price, the tenant nevertheless would be obliged to pay the difference, or the full option price to the owner. The reverse would also be true. The tenant would be entitled to receive the value of the award, although the option price were less. In other words, by the exercise of the option, the rights and obligations of the owner and the lessee became mutually binding. The New York Dock and Warehouse Company, Inc., claims that this option is one-sided, and only binding on the owner, and frankly states that if the award had been less than its option price, it would have been under no obligation to buy the property or take the award, and pay the owner the difference. It has the privilege, so it claims, of waiting until the award is made, and then, finding that the amount is in excess of the option price, claim an election and the right to the difference, which in this case is over $100,000. Such a thing cannot be * * *." The Court of Appeals also decided that the provision in the lease for its termination in the event the property involved was condemned rendered the option void.

The deficiency in the argument of appellee in this regard is that an option does not create an interest or estate in real estate or personal property. An unexercised option is essentially a unilateral contract which permits the optionee to make an election concerning the subject matter designated therein within a period prescribed. In 67 C. J. S., Option, p. 511, the following appears: "However, the very meaning of the word 'option' implies a right to act or not as the optionee may choose, and in this sense the word has been variously defined as meaning the right of choice; right of election to exercise a privilege; * * * the exercise of

the power of choice which may or may not be exercised." See, also, Annotation, 87 A. L. R. 566.

Appellee argues that an option is a right to acquire an interest in real estate and is, therefore, an equitable interest and that this court has decided an equitable owner of property is entitled to damages for injury thereto. City of Nebraska City v. Northcutt, 45 Neb. 456, 63 N. W. 807, is apparently the authority relied upon by appellee as supporting this argument. It falls far short of doing this, as the following language therein demonstrates: "Presumably, the improvements when made became a part of the realty and the property of its owner, and no right of action accrued to the plaintiff because he made them, unless he retained ownership or had some estate in the land; and in the latter case he could only recover for the injuries sustained by his particular estate. In so holding we must not be understood as deciding that one must be the owner of land in fee simple in order to recover damages for a change of grade. We simply hold that one must have some legal or equitable estate, and that his damages are confined to the injuries done that estate."

Los Angeles County Flood Control Dist. v. Andrews, 52 Cal. App. 788, 205 P. 1085, declares: "Appellant contends that at the time of the issuance of summons * * * it was an equitable owner of the land sought to be condemned. This claim is made because of the unusual manner in which Horsford indicated his execution of the option agreement. * * * Couched as the instrument was, his signing in the manner in which he did placed him in no different position than if he had merely appended his name after that of the secretary of the trust company. And his being a party to the paper was of no significance whatever. It was purely unilateral, for he made no promises above his signature, he covenanted to do nothing. In short, and without dissection of the instrument, it is plain to be seen that it was nothing but an option; and when an option is signed by

the optionee it is not because of that signature to be dignified by a higher name."

It was the duty of the trial court to instruct the jury as to each element or item shown by evidence which it should have considered in deciding the amount of the verdict appellee was entitled to have. The jury should not have been informed by the trial court of any matter which was not proper for it to have considered in arriving at a verdict in the case.

In Benedict v. Eppley Hotel Co., 159 Neb. 23, 65 N. W. 2d 224, it is said: "It is the duty of the trial court to instruct the jury fully and fairly as to items of damage it should consider in arriving at its verdict and as to the proper basis upon which damage should be assessed for each item." See, also, Wischmann v. Raikes, 168 Neb. 728, 97 N. W. 2d 551.

The jury was informed by the trial court of the option and it must be assumed that it considered the existence of it and the amount of any damage to the option of appellee because of the condemnation. There was evidence indicating that the option had a substantial value. The option price of the property, the subject of it, was $15,000. The property, by proof produced by appellant, was shown to have a value in excess of $42,000 and the evidence of the value thereof offered by appellee tended to show a value of $60,000. The expert appraiser who gave evidence at the instance of appellant referred to the value of the property in excess of the option price of $15,000 as the sum of $27,000 according to his opinion of value. He said this was "bonus value" which existed because of the option. It cannot be determined from the record that the submission of the option to the jury by the trial court did not materially influence the jury to the prejudice of appellant in the amount of the verdict in favor of appellee.

Borden v. General Insurance Co., 157 Neb. 98, 59 N. W. 2d 141, states: "The proof in a trial of a jury case must be confined to legal evidence tending to

prove or disprove an issue made by the pleadings and the admission of improper evidence is prejudicial error if it may have influenced the verdict. * * * If it does not appear from the record that evidence wrongfully admitted in the trial of a jury case did not affect the result of the trial unfavorably to the party against whom it was admitted its reception must be considered prejudicial error." See, also, Higgins v. Loup River Public Power Dist., 159 Neb. 549, 68 N. W. 2d 170; Barton v. Wilson, 168 Neb. 480, 96 N. W. 2d 270. The instructions given by the court advising the jury of the option for its consideration in deciding the amount of the recovery for appellee was prejudicial error.

Appellant complains of instruction No. 4 because it says the instruction conveys the impression that appellee was entitled to access between the property of which it was lessee and the street at all points necessary to the business of appellee. The language of the instruction in this respect was as follows: "The measure of the right of the property owner or lessees standing in the place of such owner is reasonable ingress and egress under all the circumstances, and he is not entitled to access to his land at all points in the boundary between it and the street but is limited solely to those points that are reasonably necessary in his business." A fair interpretation of that language of the court is that the measure of the right of appellee to access to the station property to and from the street was the ingress and egress which were reasonably necessary to the business there conducted and which was reasonable under all the circumstances. This did not conflict with the doctrine of this court on that subject. Hillerege v. City of Scottsbluff, 164 Neb. 560, 83 N. W. 2d 76, states: "The owner of property abutting on a street is not entitled, as against the public, to access to his land at all points in the boundary between it and a street, although entire access cannot be denied him. The measure of the right of the property owner is reasonable

ingress and egress under all the circumstances." In the immediately following paragraph of the instruction the court used the expression: "* * * and if from a preponderance of the evidence you find that such ingress and egress were reasonably necessary * * *" and because the court did not add to the words quoted the admonition "under all the circumstances," appellant says the instruction was prejudicially erroneous.

In Fielding v. Publix Cars, Inc., 133 Neb. 818, 277 N. W. 331, this court stated: "In instructions to the jury, fragments, though open to criticism when considered by themselves, are not necessarily prejudicial to the complaining party, if the charge as a whole correctly states the issues and the law applicable to the pleadings and the evidence."

An instruction will not be considered prejudicially erroneous because of a harmless imperfection which cannot reasonably be said to have confused or misled the jury in deciding the case. Whether or not there was error in a sentence or part of an instruction, it will be considered with the instruction of which it is a part and all the other instructions. The meaning of an instruction will not be determined from a single or separate phrase or paragraph but by considering all that is said on each subject or branch of the case. An admonition such as "under all the circumstances" used in one paragraph is not required to be repeated in each subsequent paragraph thereof which refers to the same subject. In re Estate of Kinsey, 152 Neb. 95, 40 N. W. 2d 526; Bolio v. Scholting, supra; Myers v. Willmeroth, 151 Neb. 712, 39 N. W. 2d 423.

Appellant complains that the final paragraph of instruction No. 4 permitted the jury to award any damage it found to have been occasioned appellee by the changing or widening of the streets. Instruction No. 5 told the jury that the ownership by appellant of land adjoining the old portion of the street and over which appellee had constructed its driveway did not affect

the right to recover damages suffered by appellee because of interference by appellant with the right of appellee to ingress and egress to and from its station. Instruction No. 7 said appellee could recover the reasonable cost of making changes in the location of its operating units and facilities and change in the surface if they were caused and made necessary by the condemnation of the part of the property taken.

Appellant says the damages mentioned in the last paragraph of instruction No. 4 were not restricted to those caused by the condemnation. The immediately preceding paragraph of the instruction concerning other items of damage that the jury was to consider commenced with the words: "If through the condemnation and improvement in the street plaintiff was affected * * *" and the last paragraph started with the words: "In addition, if you find from a preponderance of the evidence * * *." Thereby the subject of each of the paragraphs was limited to things resulting from the taking of a part of the property and the improvements made in the streets because of the taking.

Appellant substantially argues that the court in giving instructions Nos. 4, 5, and 7 failed to recognize the right of a municipality to exercise the police power delegated to it in reference to its streets. § 14-301, R. R. S. 1943. The essence of the contention in this respect is that damages resulting from the exercise of the police power by appellant are not compensable. The fact that appellant had under the police power the right to improve its streets and thereby control the traffic thereon does not mean that it had immunity from liability to respond in damages which resulted to private property abutting the improvement where a part of the property of appellee was taken by condemnation. The exercise of police power may or may not involve the taking of private property and it may or may not involve mere noncompensable inconvenience to the owner thereof. The distinction is not whether it is a valid exercise of

police power but whether or not the property itself is taken or damaged. In 18 Am. Jur., Eminent Domain, § 11, p. 639, the author says: "The real distinction, however (between eminent domain and the police power), lies in the fact that in eminent domain property or a right in property is taken from the owner and transferred to a public agency to be enjoyed by it as its own, whereas under the police power, although it may, and often does, take property in the constitutional sense so that it must be paid for, this is not accomplished by a transfer of ownership, but by destroying the property or impairing its value."

This is a condemnation proceeding originated by a petition of appellant which characterizes it as such. The petition asked the appointment of appraisers to determine the compensation appellant was required to pay in the manner and to the extent required by law, and of course there was not and could not have properly been any claim in the petition that the appellant was exempt from obligation to pay damages by reason that the municipality was exercizing the police power. Thereby appellant subjected itself to liability for all damages sustained by the taking which this court has repeatedly held includes all elements and inconveniences which affect the market value such as " 'The creation of noise and dust, the invasion of privacy, the deprivation of light and means of access, * * * and like matters * * *.' " Crawford v. Central Nebraska Public Power & Irr. Dist., 154 Neb. 832, 49 N. W. 2d 682.

In State ex rel. Westminster Presbyterian Church v. Edgecomb, 108 Neb. 859, 189 N. W. 617, 27 A. L. R. 437, this court quoted with approval from Chicago, B. & Q. Ry. Co. v. State of Illinois ex rel. Drainage Commissioners, 200 U. S. 561, 26 S. Ct. 341, 50 L. Ed. 596, the following: " 'Private property cannot be taken without compensation for public use under a police regulation relating strictly to the public health, the public morals or the public safety, any more than under a

police regulation having no relation to such matters, but only to the general welfare. The foundations upon which the power rests are in every case the same.'" See, also, City of Scottsbluff v. Winters Creek Canal Co., 155 Neb. 723, 53 N. W. 2d 543. The challenge of the instructions referred to above is not well founded and is not sustained.

Appellant contends that anticipated profits from a business cannot be considered in the assessment of condemnation damages and from that assumption appellant concludes that instruction No. 6 was wrong because it authorized the jury in finding the market value of the leasehold of appellee in the station property to consider the volume of business carried on there. There is no mention or evidence in the record of profits from the business conducted by the station on the site in question. The instruction strictly limited the consideration of the jury to the volume of business carried on by the station as it affected the value of the leasehold. This instruction has the approval of the decision in James Poultry Co. v. City of Nebraska City, 135 Neb. 787, 284 N. W. 273, in which it was said: "The volume of business done on any given leasehold has a direct relation to the value of the leasehold, as volume is directly connected with the success of the business, and diminution of business means decrease in volume." The expert appraiser produced by appellant recognized this. He testified he was acquainted with the volume of business of numerous stations, that he had appraised many of them, and that the volume of business was a feature to be considered in determining the value of such a location. The instruction complained of was not objectionable.

Appellant claims error in connection with the matters loosely referred to as changes in the grade and because instructions Nos. 7 and 8 permitted the jury to consider severance damages resulting from the construction of the streets at a different level or elevation rela-

tive to the property line of the station site. This is based on the hypothesis that as a matter of law appellee was not entitled to any consideration of this element of damages. Appellant was liable to appellee for damages to the remainder of the property which resulted from the construction of the improvement in the streets for which the condemnation power was exercised. The measure of damages was the difference between the before and after value of the tract and "* * * every element of annoyance and disadvantage resulting from the improvement which would influence an intending purchaser's estimate of the market value of such property" were proper to be considered. Chicago, R. I. & P. Ry. Co. v. O'Neill, 58 Neb. 239, 78 N. W. 521.

In the case of Rath v. Sanitary District No. One, 156 Neb. 444, 56 N. W. 2d 741, it was said, contrary to the argument of appellant: "Although conflicting, there is ample competent evidence in the record to sustain the verdict and judgment unless, as a matter of law, plaintiff was not entitled to recover consequential damages for depreciation in the value of his remaining land by severance and the construction of structures, embankment, and earthworks aforesaid, as argued by defendant. We conclude that such contention has no merit." See, also, Crawford v. Central Nebraska Public Power & Irr. Dist., supra; Quest v. East Omaha Drainage Dist., 155 Neb. 538, 52 N. W. 2d 417. This is necessarily the correct conclusion because a landowner must recover all his damages caused by the taking of land from him by condemnation and which may arise on account of the proper construction and the future operation of an improvement for which the land was taken in the condemnation proceeding. Churchill v. Beethe, 48 Neb. 87, 66 N. W. 992, 35 L. R. A. 442, stated: "It is now the settled law of the state that for all injuries which may arise on account of the proper construction or future operation of an improvement, an adjoining proprietor must be compensated in the orig-

inal condemnation proceedings." See, also, State v. County of Cheyenne, 157 Neb. 533, 60 N. W. 2d 593; Gruntorad v. Hughes Bros., 161 Neb. 358, 73 N. W. 2d 700; McGree v. Stanton-Pilger Drainage Dist., 164 Neb. 552, 82 N. W. 2d 798.

The judgment should be and it is reversed and the cause is remanded to the district court for Douglas County for further proceedings according to law.

REVERSED AND REMANDED.