F. C. STANGL, III, Plaintiff and Appellant,

v.

Burton M. TODD et al., Defendants and Respondents.

MARATHON STEEL COMPANY, Plaintiff,

v.

Burton M. TODD et al., Defendants, Third-Party Plaintiffs and Respondents,

v.

F. C. STANGL, III, Third-Party Defendant and Appellant.

No. 14105.

Supreme Court of Utah.

Sept. 2, 1976.

---

7. The opinion cites a number of Utah cases holding to the same effect.

Frederick S. Prince, Jr., Kenneth W. Yeates, J. Rand Hirschi, of Prince, Yeates, Ward & Geldzahler, Salt Lake City, for plaintiff-appellant.

Earl D. Tanner, of Earl D. Tanner & Associates, Salt Lake City, for defendants-respondents.

MAUGHAN, Justice.

Plaintiff, a building contractor, brought this action to foreclose a mechanic's lien, for construction work performed pursuant to an agreement to build a high-rise apartment complex. Defendants filed a counterclaim seeking damages, for plaintiff's breach of a construction contract. Upon trial to the court, after allowing an offset for labor and materials furnished by plaintiff, defendants were awarded damages of $340,877. Plaintiff appeals.

Answers to two questions are definitive of this appeal. Was there a contract, and did the trial court adopt the correct measure of damage? There was a contract, and damage was correctly determined. We affirm. No costs awarded.

Defendants desired to build an apartment complex. They retained the services of an architect to draft the plans. The architect introduced defendants to plaintiff, an experienced contractor, with whom the architect had worked on other projects. In June, 1972, defendants requested plaintiff prepare a cost estimate to submit to a prospective mortgagee. Plaintiff, utilizing the preliminary plans, prepared a cost breakdown sheet itemizing the expenses for each of the various components involved in the construction of the project.

Accompanying this estimate was a letter, in which plaintiff represented that, although it was impossible to give an exact bid without exact plans, he had by using the construction management method, been able to give a prospective owner a preliminary proposal indicating a basic type of construction. Also, this, together with his initial participation in the engineering and selection of specified materials, had enabled him to build over 100 projects; and hold within the budget projected in the preliminary proposal. This estimated cost was $2,359,000. The price was increased to $2,399,222 after the addition of several items. Defendants then secured a loan commitment for $2,350,000.

The architect proceeded to develop the plans and specifications, and plaintiff was in frequent contact observing and participating in the design. Plaintiff had his lawyers draw a written document, entitled a "construction agreement." He presented it to defendants about October 10, 1972. Defendants suggested three minor changes. On October 11, defendants executed and delivered the note, trust deed, and land lease for the project. The next day they met with plaintiff, and the three executed the construction agreement.

Plaintiff commenced performance on October 15, 1972. The site was cleared of existing structures; the land was excavated, the footings poured, and much of the re-bar for the foundations was placed. By December, plaintiff was ready to pour the foundation for the east tower of the complex, but the work was delayed by bad weather. When the weather improved, plaintiff refused to continue the construction for the contract price.

The parties conferred several times in January, 1973, and plaintiff presented a cost breakdown reflecting the bids he was receiving from subcontractors. At this time, plaintiff's estimated cost of con-

structing the project was $2,700,000, plus 10 per cent overhead.[1]

Later, other bids were sought, plaintiff submitting bid of $3.4 million, which was lower than the other bids received.

In March, 1973, defendants sent plaintiff a letter stating his default; and demanding he resume construction, under the contract. Thereafter, plaintiff filed a mechanic's lien for the completed work and this action ensued.[2]

Defendants abandoned the project; the partial construction was razed. They presented evidence showing their expenditure and loss of $276,390.32, in advancing the project. This sum included the loan commitment fees; and a $50,000 bonus they were required to pay, to repurchase the property which had been subject to a long-term lease.

This matter was tried to the court, over a period of three weeks during which there were many contested issues of fact. The trial court found: On October 12, 1972, the parties entered into a written contract by which plaintiff agreed to construct, in accordance with plans and specifications, a 183-unit apartment complex, for which defendants agreed to pay plaintiff $2,399,222, plus a sum representing the value of extra work, if any. By the time the parties executed the construction agreement, they were in substantial agreement as to all material aspects of the building to be constructed for the fixed price, and the plans and drawings substantially reflecting their agreement had been prepared by the architect, examined by the parties, and become part of the construction agreement. Pursuant to the construction agreement, additional plans and detailed working drawings were developed. Such plans did not depart from the understanding the parties had at the time they executed the agreement. There were specified extras for which plaintiff was to be compensated by defendants, in addition to the agreed price, again according to the agreement. The reasonable worth of these extras was $189,475.

Further findings were: On about January 15, 1973, plaintiff, without just cause or excuse, ceased work under the agreement, removed his tools and equipment from the construction site, advised defendants he would not perform the agreement, for the price fixed therein. Such conduct was a material breach of the construction agreement. At the time of the breach of the agreement, the reasonable cost of completion, including those items incorporated in plans and specifications for which plaintiff was to be compensated as extras, was $2,970,450. If plaintiff had performed the work and furnished the extras, he would have been entitled to $189,475 in addition to the contract price of $2,399,222. As a result of plaintiff's breach, defendants have been damaged in an amount equal to the difference between the reasonable cost of completion of the project, $2,970,450, and the unpaid portion of the contract price, $2,399,222; less extras in the amount of $189,475; less an offset for partial construction by plaintiff, in the sum of $40,876. The result of such calculations equals damages in the sum of $340,877.[3]

Additional findings were: As a matter of law, the construction agreement was a valid, binding contract, which obligated plaintiff to construct the project in substantial compliance with the plans and specifications, for a fixed price, plus the reasonable worth of any agreed extras. The agreement provided for resolution of conflicts and for the incorporation of extras and additions, and inclusion of such items did not invalidate the agreement. The

---

1. Based on this figure, plus included extras, the trial court found the cost of completion to be $2,970,450.

2. The partial construction was found, by the trial court, to have the reasonable value of $40,896.

3. See *Ross v. Danter Associates, Inc.*, 102 Ill.App.2d 354, 242 N.E.2d 330 (1968).

construction agreement was not invalidated by the ambiguity of any provision or by uncertainty of its terms: The agreement was neither preliminary, nor tentative; and did not constitute an agreement to agree. According to the court's ruling, the agreement, having been prepared by plaintiff's attorney pursuant to plaintiff's instructions, was to be construed against the scrivener.

On appeal, plaintiff contends the parties had not reached an agreement sufficiently definite and certain to support a finding that plaintiff had committed a breach. Specifically, plaintiff argues the evidence clearly shows the parties never agreed on a contract price, construction materials, or details for the apartment complex. Thus, asserts plaintiff, the agreement was not a binding contract.

The construction agreement is an eight-page document, together with additional attachments. It was drafted by plaintiff's attorney and contains an integration clause expressing it represents the full and complete understanding of the parties. Plaintiff agreed to furnish all of the labor and materials and to do all things necessary for the proper execution, construction and completion of the work in accordance with the contract. The contract further provides:

*Section 2.2* The parties hereto agree that Contractor has prepared the contract price based upon preliminary plans and specifications prepared by Ronald Molen, AIA. Detailed working drawings have not yet been finally prepared. Contractor, Architect and Owner shall work together in preparation of final drawings and with the approval of Architect and Owner, Contractor shall have the right to specify materials to be used. The letter attached hereto as Exhibit "C" with its attached cost breakdown, sets forth types of materials to be speci-fied in the final plans and working drawings and also a cost breakdown for the respective items in the project. Any deviations from the items specified in the letter shall cause an adjustment in the price, as set forth on the attachment.

Plaintiff cites *Robinson & Wilson, Inc. v. Stone,*[4] wherein the court stated that whether a contract as interpreted by the trier of fact is sufficiently definite and certain in its essential terms to give rise to a legal obligation is a question of law. The court recited the general principle that where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable. The court ruled that Article 20 of a construction contract was too uncertain in essential respects to give rise to an enforceable legal obligation. The court explained:

Absent plans and specifications, an agreement to provide labor and materials for the completion of "standard" or "minimal" medical suites is too indefinite and uncertain to evidence a meeting of the minds respecting the scope of the work or to provide an objective basis for assessment of damages.[5]

■ The operative facts here are considerably different. The trial court found that at the time the contract was executed, the plans and drawings reflecting the parties' agreement had been prepared by the architect, examined by the parties, and become part of the contract. Furthermore, as the plans were developed, the details of construction and the materials did not depart from the understanding of the parties at the time the contract was executed.

■ This court has long adhered to the principle that in construing a contract, a construction giving an instrument a legal effect to accomplish its purpose will be adopted where reasonable, and between

4. 35 Cal.App.3d 396, 110 Cal.Rptr. 675 (1973).

5. At p. 683 of 110 Cal.Rptr.

two possible constructions that will be adopted which establishes a valid contract.[6]

> . . . a contract should be construed if logically and legally permissible, so as to effectuate valid contractual relations, rather than in a manner which would render the agreement invalid, or render performance impossible. [Citations] . . .[7]

Plaintiff, contrary to the rule of appellate review, has marshaled all the facts which he claims provide an evidentiary basis to indicate an uncertainty as to the terms of the agreement. A mixed question of law and fact will be sustained by this court where it appears, as here, the trial court based its determination upon substantial evidence, and ruled as a matter of law there was an enforceable contract.[8]

Plaintiff further contends the trial court erred in ruling the proper measure of damages to be the cost of completion, for breach of a construction contract. It is asserted the fair market value of the project, if completed, should be the reasonable and proper standard. Plaintiff points out the work performed was demolished, and this was not a case where the construction was abandoned after substantial work had already been performed. It is claimed the damages awarded to defendants constituted a windfall.

In *Rex T. Fuhriman, Inc. v. Jarrell*[9] this court adopted the standard set forth in the Restatement, Contracts, Section 346(1), for the damages recoverable for breach of a construction contract:

> (a) For defective or unfinished construction he can get judgment for either
>
> (i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or
>
> (ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if construction and completion in accordance with the contract would involve unreasonable economic waste.

Completion of the building, plaintiff claims, would have constituted economic waste, and defendants' recovery should be limited, by the standard of fair market value. Plaintiff then insists the judgment should be reversed; because defendants failed to meet their burden of proving the fair market value of the completed project, and only presented evidence concerning cost of completion.

■ The contract breaker should pay the cost of construction and completion in accordance with his contract, unless he proves, affirmatively and convincingly, such construction and completion would involve an unreasonable economic waste.[10] This, plaintiff did not do.

■ Plaintiff neither presented evidence of the market value of the completed project, nor that this value would be a substantial deviation from the cost of completion. Under such circumstances, plaintiff did not sustain his burden of proof, viz., that completion would involve unreasonable economic waste.

HENRIOD, C. J., and ELLETT and CROCKETT, JJ., concur.

TUCKETT, J., does not participate herein.

---

6. *Driggs v. Utah Teachers Retirement Board*, 105 Utah 417, 431, 142 P.2d 657 (1943).

7. *Mohr Park Manor, Inc. v. Mohr*, 83 Nev. 107, 424 P.2d 101, 104, 31 A.L.R.3d 513 (1967).

8. *Winger v. Gem State Mutual of Utah*, 22 Utah 2d 132, 449 P.2d 982 (1969).

9. 21 Utah 2d 298, 445 P.2d 136 (1968).

10. 5 Corbin On Contracts, Sec. 1089, p. 488; *Blecick v. School District No. 18 of Cochise County*, 2 Ariz.App. 115, 406 P.2d 750 (1965).